IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAWN MARTIN, | ) | CASE NO. 1:14-cv-01396 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Dawn Martin ("Plaintiff" or "Martin") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Supplemental Security Income.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 12.  The Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Martin protectively filed[1] an application for Supplemental Security Income on September 15, 2010.[2]  Tr. 28, 108, 192, 236.  She alleged a disability onset date of February 9, 2004.[3]  Tr. 28, 235.   Martin alleged disability based on insulin dependent diabetes, heart condition and

---

[1]The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 8/4/2015).

[2] Martin had previously filed for social security disability benefits in 2007, 2008, and 2009. Tr. 28. Those applications were denied.  Tr. 28.

[3] The administrative record also contains at least one record showing an alleged disability onset date of February 8, 2004.  Tr. 192.

hearing loss.  Tr. 118, 125, 239.  After initial denial by the state agency (Tr. 118-120), and denial upon reconsideration (Tr. 125-127), Martin requested a hearing (Tr.128-230).  On August 7, 2012, Administrative Law Judge Pamela E. Loesel ("ALJ") conducted an administrative hearing.  Tr. 43-81.

In her September 12, 2012, decision (Tr. 25-42), the ALJ determined that Martin had not been under a disability since September 15, 2010, the date her application was filed.  Tr. 28-37.  Martin requested review of the ALJ's decision by the Appeals Council.  Tr. 21.  On May 20, 2014, the Appeals Council denied Martin's request for review, making the ALJ's decision the final decision of the Commissioner.[4]  Tr. 1-6.

## II. Evidence

### A.    Personal, educational and vocational evidence

Martin was born in 1958.  Tr. 36, 192, 235.  At the time of the hearing, Martin was living in a house with her roommate.  Tr. 51.  Martin last worked in 2008 for a few months.  Tr. 54.  Her past employment consisted primarily of office manager type work.  Tr. 54-59, 67-68.

### B.    Medical evidence[5]

#### 1.  Treatment history[6]

##### a.  Heart condition

In February 2004, Martin had a heart attack and was admitted to the hospital for three days.  Tr. 62, 335.  She underwent a stenting procedure  in her left anterior descending (LAD) artery and was discharged home in "improved" condition.  Tr. 335.  In September 2006, Martin

---

[4] On December 17, 2012, as part of Martin's request for review, she submitted medical records from MetroHealth Medical Center dated January 6, 2012, through November 27, 2012.  Tr. 5, 788-1030.

[5] The medical evidence summarized relates primarily to Martin's physical impairments because Martin challenges only the ALJ's findings regarding her physical residual functional capacity.

[6] Martin received medical treatment primarily through medical providers at MetroHealth Medical Center.

experienced left-sided chest pain and was seen and admitted at the hospital.  Tr. 442-443.  Martin was treated and discharged home in "improved" conditions with instructions to follow up with cardiologist Dr. Thomas Vrobel and her primary care physician Dr. Vivan Tran regarding an incidental finding of an enlarged thyroid.  Tr. 443.  Martin saw Dr. Tran for a follow-up on October 3, 2006.  Tr. 439-441.  Dr. Tran ordered a thyroid ultrasound and noted that lab results (TSH, free T4 and T3) from September 9, 2006, were within normal limits.  Tr. 439, 441.  During that visit, Dr. Tran also noted that the cath performed during the September 2006 hospitalization showed "severe proximal disease of small 2nd diagonal branch" which was too small for stenting and Martin's previous LAD stent was patent.  Tr. 439.  Martin's chest pain was no longer present and Martin reported that she was doing well.  Tr. 439.

Upon Dr. Vrobel's referral, on May 14, 2008, Martin underwent a cardiac stress test.  Tr. 363-365.  The test results showed a "normal exercise stress test without evidence of stress induced ischemia."  Tr. 365.  Based on the test, Martin's prognosis was suggested to be good.  Tr. 365.  Dr. Vrobel's January 14, 2009, progress notes reflect that Martin was doing well, losing weight, and exercising every day without symptoms.  Tr. 375.  On July 28, 2009, Martin underwent a cardiac stress test with results similar to those of the May 2008 tests.  Tr. 353-355.

During a July 14, 2010, follow-up visit, Dr. Vrobel noted that Martin was doing well except she was upset because of the death of her father and nephew.  Tr. 479.  Dr. Vrobel indicated that Martin was having some stress related discomfort in her upper chest but it was different from prior myocardial infraction pain that was in her lower chest and into her right arm.  Tr. 479.  Martin had gained 20 pounds but was attending Zumba classes to try to lose weight.  Tr. 479.  Other than vertigo with turning, Martin was not having any symptoms while taking Zumba classes.  Tr. 479.  Martin reported having aching pain at night and pain below her knees

when standing but no pain when walking.  Tr. 480.  Martin's physical examination showed no edema in her extremities; normal heart rate and rhythm with no murmurs, gallops, or clicks; and good breath sounds.  Tr. 481.  Martin was grossly intact neurologically.  Tr. 481.  Dr. Vrobel concluded that Martin was stable and trying to lose weight.  Tr. 482.

On January 14, 2011, Martin presented to the emergency room with complaints of chest pain.  Tr. 610.  Martin reported dull pain in the mid-sternal area and sharp pain on her left side.  Tr. 610.  Martin reported having a hard time taking deep breaths.  Tr. 610.  Her pain subsided with rest.  Tr. 610.  Martin was admitted to the hospital.  Tr. 621, 628.  A number of tests were performed.  Tr. 621-622.  Martin's testing showed negative enzymes, a negative stress test, and a normal EKG.  Tr. 622.  In light of the negative enzymes and negative stress test, Martin's physician opined that Martin's reports of chest pain following her stress test were likely musculoskeletal as opposed to cardiac related.  Tr. 622.  On January 17, 2011, Martin was diagnosed in an "improved" condition, with a diagnosis of unspecified chest pain.  Tr. 610-621.  Discharge instructions included instructions to follow a low cholesterol and low saturated fat diet but there were no restrictions with respect to her activities.  Tr. 621.  On January 26, 2011, Martin saw Dr. Vrobel for a follow-up regarding her recent hospitalization for chest pain.  Tr. 602-605.  Dr. Vrobel concluded that Martin was doing better from her recent non-cardiac chest pain but she was still anxious.  Tr. 605.  Dr. Vrobel indicated that Martin needed to get back into exercising.  Tr. 605.

Martin saw Dr. Vrobel on August 3, 2011.  Tr. 704-710.  Martin was staying in air conditioning due to the heat and was not having cardiac symptoms.  Tr. 704.  Dr. Vrobel indicated that Martin was doing well clinically.  Tr. 708.

### b.  Diabetes

On September 30, 2004, Martin was seen at MetroHealth.  Tr. 305.  Martin indicated that for several weeks she was having occasional numbness and tingling in both of her fourth toes. Tr. 305.  She reported a prior diagnosis of diabetes.  Tr. 305.  She thought her symptoms had worsened over the prior week because she ran out of her diuretic and she thought her legs were a little swollen.  Tr. 305.  Otherwise, she had no other numbness, tingling or weakness.  Tr. 305. Diagnoses during her September 30, 2004, office visit included diabetes mellitus type II without complications.  Tr.  307.  Life style changes were recommended, including exercise, education and diet.  Tr. 307.

On April 24, 2009, Martin saw physicians at MetroHealth with concerns regarding swelling in her legs and tingling in her feet.  Tr. 402-404.  She was obtaining relief with Lasix which she was taking daily.  Tr. 402.  Her at-home blood sugar levels ranged from 140-180.  Tr. 402.  Lab work was ordered and her physicians recommended an increase in her insulin to keep her sugar levels below 150.  Tr. 402, 404.

On November 4, 2009, Martin saw physicians at MetroHealth wanting to discuss controlling her diabetes mellitus.  Tr. 538-544.  Martin reported having been on insulin since 2006 and was tired of it.  Tr. 538.  Her blood sugar levels had been running between 200 and 250.  Tr. 538.  She was exercising regularly four times per week and eating healthy but she did drink cola.  Tr.  538.  Martin's physicians prescribed Lantus to try to reduce Martin's use of insulin.  Tr. 542-543.  On December 4, 2009, Martin was seen at MetroHealth for a follow-up visit regarding her diabetes.  Tr. 529-534.  Lantus was working well. Tr. 529.  Martin was having some nausea, which she attributed to poor sleep.  Tr. 529.  Martin denied polydipsia and polyuria.  Tr. 529.  Martin reported some stress at home because her boyfriend was out of work but she was still continuing to work out five days per week and her weight had remained stable.

Tr. 529.  On physical examination, Martin had trace amounts of edema bilaterally; her pulses were palpable; and she had normal sensation to touch and pin-prick in her feet bilaterally.  Tr. 531.  Martin's physicians added Lispro and advised Martin to continue with the Lantus, glucose checks, and insulin.  Tr. 533.

During a May 3, 2010, follow-up regarding her diabetes, Martin's daily sugar levels were in the range of 190 to 228.  Tr. 498.  Martin did not have an interval history of hypoglycemic episodes and she denied polydipsia, polyphagia, polyuria, new numbness or tingling in her hands and feet, and chest pain or shortness of breath.  Tr. 498.  Martin reported having bouts of dizziness especially when moving her head the wrong way.  Tr. 498.  A physical examination revealed that there was no edema, pulses were palpable, and there was normal sensation in feet and hands bilaterally to blunt and pin touch.  Tr. 501.  Dr. Jaya Goel, M.D., who saw Martin during the visit, concluded that Martin's diabetes was uncontrolled; Martin had not been compliant with her diet because she had no fixed time for eating and snacked a lot.  Tr. 502.  Dr. Goel adjusted Martin's medication and recommended that Martin see a nurse practitioner regarding carb counting and to learn about a flexible insulin plan.  Tr. 501, 502.

On July 14, 2010, Martin was seen at MetroHealth for a follow-up visit regarding her diabetes.  Tr. 483.  Martin's daily sugar levels were in the range of 180 to 220.  Tr. 483.  Martin had recently seen a podiatrist for an ingrown toenail.  Tr. 483.  Martin denied polydipsia, polyphagia, and polyuria.  Tr. 483.  She reported intermittent chest pain without shortness of breath for which she was taking aspirin.  Tr. 483.  Martin indicated that she had not taken nitroglycerin since 2004.  Tr. 483.  Martin had gained weight due to stress eating and not exercising.[7]  Tr. 483.  She reported having recently started Zumba classes and was feeling better.

---

[7] Martin's father died earlier that year in May and her nephew passed away the prior weekend.  Tr. 483.  Martin's doctor noted that Martin should see someone for grief counseling and to talk about her stress.  Tr. 483.

Tr. 483. Martin had some edema and her distal pulses were difficult to palpate. Tr. 486. Her sensation was intact. Tr. 486. Martin's doctor concluded that Martin's control of her diabetes was suboptimal and added Metformin to her medications. Tr. 486.

On September 20, 2010, Martin saw her doctors with complaints of numbness just below her knee. Tr. 466. Martin indicated that her diabetes was currently under reasonable control. Tr. 466. On physical examination, Martin's sensory sensation in her legs was normal; her reflexes were normal; there was no muscle wasting; and she had 5/5 strength bilaterally. Tr. 469. Martin's physician concluded that there was a possibility that Martin's numbness was diabetic neuropathy but also noted that there was no loss of any sensation and no muscle wasting. Tr. 470.

During an October 26, 2010, follow-up visit regarding her diabetes, Martin reported that she was checking her sugar levels twice a day and that her sugar levels ranged from 96 to 180. Tr. 548. Martin denied polydipsia, polyphagia, and polyuria. Tr. 548. There was no interval history of hypoglycemic episodes. Tr. 548. Martin denied new numbness or tingling in her hands and feet. Tr. 548. She had been having some intermittent chest pains occurring mostly with walking or exertion. Tr. 548. Martin indicated that Dr. Vrobel had told her that some chest pain was natural. Tr. 548. Martin's weight was stable and she was continuing to exercise daily. Tr. 548. Martin's diabetes medication was adjusted. Tr. 551. She declined a nutrition referral to discuss carb counting. Tr. 551.

On April 12, 2011, Martin saw her doctors regarding her diabetes. Tr. 596-600. Martin reported that she had been checking her blood sugar levels once or twice each day and her blood sugar levels had been in the 104 to 196 range. Tr. 596. Martin had no interval history of hypoglycemic episodes and she denied polydipsia, polyphagia, and polyuria. Tr. 596. She also

denied new numbness or tingling in her hands and feet.  Tr. 596.  However, she was having

tingling and numbness in her toes and numbness in her knees.  Tr. 596.  Martin reported nocturia

about once per night.  Tr. 596.  Martin's weight had been stable but she had not been exercising

because she had been feeling down.  Tr. 596.  Martin had been attending an RCIA program with

her boyfriend who was already Catholic and Martin reported that she was excited and happy to

be making her first reconciliation and confirmation in the coming weeks.  Tr. 597.  Martin's

diabetic medication was adjusted based on her labs.  Tr. 598.  Her doctor felt that her knee pain

was likely a depressive manifestation. Tr. 598.  An April 19, 2011, knee x-ray was normal.  Tr.

657.

On October 5, 2011, Martin was seen for a regular follow-up visit.  Tr. 718.  Her diabetic

pedal neuropathy was stable with no medication. Tr. 718.  Martin's glucose readings were better

but she was still having some relative hypoglycemia readings when she had not eaten dinner.  Tr.

720.  With there being concern that Martin had poor control of her diabetes over a longer time

period, a nutrition referral was made to address carb counting, diabetic diet and education.  Tr.

720.

On November 28, 2011, Martin was seen for cold-like symptoms.  Tr. 748.  During her

visit, Martin reported that she had been checking her sugar levels at home once or twice a day

and her levels were in the range of 104 to 180.  Tr. 748.  Martin's pedal neuropathy was noted to

be stable with no medication.  Tr. 748.

### c.  Vertigo/dizziness

Martin has a history of complaints of dizziness and vertigo.[8]  *See e.g.*, Tr. 479, 483, 489,

492, 496, 503, 509, 545, 591, 755.  On April 11, 2010, Martin presented to the emergency room

with complaints of dizziness.  Tr. 506-521.  Martin reported that she had been intermittently

---

[8] Martin has also complained of headaches, including migraines.  Tr. 498, 503, 642.

dizzy for two days.  Tr. 506.  She indicated that the she had accidentally been taking double doses of her potassium medication.  Tr. 506.  She complained of nausea without vomiting.  Tr. 506.  Martin had various tests performed, including a head MRI (Tr. 344) and head and inner ear CT scans (Tr. 347, 349).  Martin's head MRI showed "[m]ild global parenchymal volume loss and subcortical microvascular ischemic change.  No frank infarction nor other acute intracranial abnormality."  Tr. 344.  Her head CT scan showed "[g]eneralized atrophy without focal abnormality."  Tr. 347.  Her inner ear CT revealed "[i]nterval left mastoidectomy with reconstruction of the ossicles and placement of ossicle prosthesis" and "[a] small amount of soft tissue . . . in the anterior mastoid bowl, smaller than on prior exams."  Tr. 349.  There was no bony destruction seen.  Tr. 349.  Martin was admitted for one night and discharged with a diagnosis of benign positional vertigo.  Tr. 515.

On June 29, 2010, Martin saw her physician Dr. Freedom Johnson, M.D., for an urgent vertigo related visit.  Tr. 492.  Martin reported that her vertigo had stopped somewhat but her vertigo woke her up from her sleep a couple days earlier.  Tr. 492.  Dr. Johnson indicated that Martin experienced "true vertigo, mostly while laying down."  Tr. 492.  Dr. Johnson noted that Martin's vertigo was not provoked by any particular motion and she had gotten some relief through the use of Ativan.  Tr. 492.  Dr. Johnson also noted that Martin had flown to California the prior month without experiencing adverse symptoms around the time of her flight.  Tr. 492. That same day, Martin had an audiological evaluation, which showed that there had been a slight decrease "in aid conduction from 2000-6000Hz at the left ear.  Right ear and bone conduction remains stable."  Tr. 489.

On May 4, 2011, Martin was seen for sharp, intermittent left ear pain.  Tr. 591.  She reported that she experienced vertigo on and off and "just deals with it" and lies down when it

occurs.  Tr. 591.  Following removal of ear wax, Martin was feeling better and was advised to return if her pain returned.  Tr. 591.

### d.  Hearing problems

Martin has had problems with her hearing since she was three years old, including the need to use hearing aids and undergo surgical procedures.  *See e.g.,* Tr. 65 (hearing testimony), 324 (January 2006 medical record reflecting extensive history of ear infections and surgical procedures involving left ear); Tr. 524 (December 2009 medical record discussing hearing aid); Tr. 496 (May 2010 record reflecting a long history of left ear problems and that, due to an unsuccessful BAHA (bone anchored hearing aid) trial, Martin was resigned to using a hearing aid).  In June 2010, Martin's audiologist indicated that testing showed "[m]ild sensorineural hearing loss at the right ear and a severe to profound rising to mild mixed hearing loss at the left ear."  Tr. 489.  The audiologist also noted that there had been a slight decrease "in aid conduction from 2000-6000Hz at the left ear.  Right ear and bone conduction remains stable."  Tr.  489.

### 2.  Medical opinions

### a.  Consultative examining physician

On September 2, 2009, consultative examining physician Eulogio Sioson, M.D., CIME ("Certified Independent Medical Examiner), saw Martin for a one-time disability evaluation.  Tr. 286-292.  Martin reported that her medical problems included diabetes mellitus, heart problems, hypertension, and back/joint pain.  Tr. 286.  Among his physical examination findings, Dr. Sioson indicated that Martin walked normally with no assistive device; she lost her balance trying to do heel/toe walking and rose from a half squat with back pain; she was able to get up and down from the examination table; heart sounds were regular, with no significant murmur;

extremities showed no edema, varicosities, ulceration or stasis changes; Martin complained of

pain in her right hip and groin with range of motion testing; there was no heat, redness, swelling,

subluxation or gross deformity of the joints; Martin was able to grasp and manipulate with each

hand and had palpable pedal pulses; there was moderate lower back tenderness; straight leg

raising sitting resulted in pain in Martin's right hip from 90 to 0 degrees and straight leg raising

lying resulted in pain in Martin's right hip/groin at 55 degrees but negative at 70 degrees; and

Martin had no rigidity, tremors, sensory deficits or muscle atrophy.  Tr. 287.  Dr. Sioson

indicated that the manual muscle testing was affected by pain.  Tr. 287, 288-290.  In particular,

Dr. Sioson noted on the manual muscle testing form that there was "pain back, right hip/groin,

feet."  Tr. 290.

Dr. Sioson concluded that: (1) with respect to Martin's hypertension and heart issues,

"[s]he had no overt congestive heart failure with atypical chest pain;" (2) with respect to

Martin's diabetes mellitus, "[s]he had near normal uncorrected vision and no apparent peripheral

neuropathy using nylon filament;" and (3) with respect to Martin's back/joint pains, "[s]he had

no apparent radiculopathy, gross deformity or inflammatory changes in her joints."  Tr. 287.  Dr.

Sioson also concluded:

> In summary, based on objective findings, no specific restriction to work-related
> activities seem evident but if one considers limitation of range of motion from
> pain, work-related functions such as walking, standing, sitting, carrying and
> lifting would be impaired and limited to sedentary activities.   Hearing and
> speaking should not be affected.

Tr. 287.

### b.  State agency reviewing physicians

On November 18, 2010, state agency reviewing physician Dimitri Teague, M.D.,

completed a Physical Residual Functional Capacity Assessment.  Tr. 557-564.  Dr. Teague

opined that Martin had the following exertional limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hours workday; and push and/or pull unlimitedly, other than as shown for lift and/or carry.  Tr. 558-559.  As explanation for the limitations, Dr. Teague noted a normal ECG in July 2009 and no evidence of stress induced ischemia.  Tr. 558-559.  Dr. Teague noted a stenting in 2004.  Tr. 558-559.  He also noted normal examinations with sensory intact in Martin's lower extremities, no muscle wasting, and no neuropathies noted in 2010.  Tr. 558-559.

Dr. Teague also opined that Martin had the following postural limitations: never climb ladders/ropes/scaffolds; occasionally climb ramps/stairs; and frequently balance, stoop, kneel, crouch, and crawl.  Tr. 559.  Dr. Teague noted that Martin's postural limitations were due to vertigo from inner ear disorder, more severe on the left than right.  Tr. 559.

Dr. Teague found no manipulative or visual limitations. T r. 560.  Dr. Teague opined that Martin's hearing ability was limited due to mild sensorineural hearing loss in the right ear and severe to profound rising mild to mixed hearing loss on the left ear that did not respond well to the use of hearing aids.  Tr. 561.

As for environmental limitations, Dr. Teague opined that Martin should avoid all exposure to hazards such as machinery and heights due to her vertigo.  Tr. 561.

As further explanation for his opinions, Dr. Teague stated the following:

The claimant['] s MDI [medically determinable impairment] could reasonably be expected to produce the alleged symptoms but the impact on functioning and the intensity of the symptoms is not totally consistent with the objective medical evidence.  Specifically, the claimant states that she has nitroglycerin tablets and that she last used them 4-5 months ago.  In the medical records she indicates that she has not used nitro since her MI in 2004.  She states that she could only walk for 30 minutes to half an hour and then would need to sit down, the objective medical evidence suggests no neuropathies in her LE and thus suggests greater

> ability [to] stand for longer periods. The claimant is able to maintain adequate
> ADLs, and is able to cook and do her own grocery shopping. There is also
> records of the clmnt not being compliant with medication for DM. From this the
> claimant is considered partially credible.

Tr. 562.

In offering his opinion, Dr. Teague also considered the opinion of Dr. Sioson but gave

that opinion little weight indicating that Dr. Sioson's assessment that Martin could do sedentary

work was "more restrictive than the current evidence suggests" and Dr. Sioson had not addressed

Martin's hearing loss. Tr. 563.

On June 13, 2011, Linda Hall, M.D., conducted a review of the evidence in the file and

affirmed Dr. Teague's assessment. Tr. 668.

**C.     Alleged "new" and "material" evidence**

Martin seeks a sentence six remand under 42 U.S.C. 405(g) for the purpose of

considering alleged new and material evidence that existed at the time of the August 7, 2012,

hearing and was submitted to the Appeals Council but not to the ALJ. Doc. 15, pp. 6-7, 10-12;

Tr. 4, 788-1030. Martin asserts that the alleged "new" evidence shows that, as stated by her

counsel during the administrative hearing, she suffered from carpal tunnel syndrome and

polyneuropathy. Doc. 15, p. 11 (referencing Tr. 50).

**D.     Testimonial evidence**

**1.     Plaintiff's testimony**

Martin was represented and testified at the administrative hearing. Tr. 51-66, 67-68.

Martin stated that she alleged disability beginning in 2004 because that was when she was

diagnosed with diabetes and had a heart attack. Tr. 62-63. Martin stated she has had hearing

problems since she was 3 years old. Tr. 65. She has diverticulitis, which impacts the types of

food that she can eat. Tr. 65.

Martin and her roommate started living together about 8 years following her heart attack in 2004.  Tr. 51.  Martin's roommate was paying all the bills.  Tr. 51.  Martin indicated that early on she was able to take care of most of the chores around the house but it has been difficult for her due to her pain.  Tr. 51-52.  When doing dishes, she can stand for about 10-15 minutes and then sits down for about 10-15 minutes before getting up to try to do more some more dishes.  Tr. 52.  She can vacuum but it takes her all day because she gets a burning sensation in her back.  Tr. 52.   Martin has a difficult time going up and down stairs.  Tr. 52.  Martin helps with laundry but her roommate has to take the laundry downstairs and bring it back upstairs for her.  Tr. 52-53.  Martin can cook quick meals.  Tr. 53.  Her roommate usually does the grocery shopping.  Tr. 53.  If Martin does go shopping, she uses an electric cart.  Tr. 53.  Martin drives only if she cannot get a ride and only to go to a doctor's appointment.  Tr. 53-54.   Martin does not use public transportation.  Tr. 54.

As far as social activities, Martin indicated that her sister visits with her and will take her to the grocery store or to doctor appointments.  Tr. 63.   Martin has not been out to the movies in about 8 years.  Tr. 63.  She cannot sit through an entire movie at home without having to switch positions.  Tr. 63-64.  She is generally able to take care of her personal grooming.  Tr. 64.  As far as bathing, though, she takes baths rather than showers because her vertigo causes dizziness.  Tr. 64.

Martin is unable to lift a gallon of milk with one hand.  Tr. 59-60.  She can use two hands to pour a glass of milk from a gallon container but it causes shooting pain in her arms.  Tr. 60.  They usually buy half-gallon containers of drinks because, while she still has pain when pouring from a half-gallon container, the pain is less than when she pours from a gallon container.  Tr. 60.  Martin estimated being able to walk a block in about 20 minutes with resting in between.

14

Tr. 60-61.  Martin can sit for about 30 minutes maximum at a time.  Tr. 61.  After standing for

about 10-15 minutes, Martin starts to feel a burning sensation in her hip and back.  Tr. 62.  She

stated she could force herself to stand for 20 minutes.  Tr. 62.  Martin does not think she would

be able to perform a purely desk job such as one involving sitting and answering phones and

taking messages because there would be no way she could sit for 8 hours without being in pain.

Tr. 66.

### 2.      Vocational Expert's testimony

 Vocational Expert ("VE") Nancy J. Borguson testified at the hearing.  Tr.  66-80.  The

VE described Martin's past work as an office manager as a light, semi-skilled position.  Tr.  68.

Although Martin noted that she lifted up to 25 pounds on occasion, as performed, Martin

generally performed light work with tasks such as "filing, scheduling, doing payroll."  Tr. 68.

 The ALJ asked the VE to assume a hypothetical individual having the same age,

education, and past work as Martin who is able to: occasionally lift 20 pounds and frequently lift

10 pounds; stand and walk for 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour

workday; push and pull unlimitedly other than as stated for lift and/or carry limits; can

occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds; can frequently

balance, stoop, kneel, crouch and crawl; must avoid loud noisy environments due to limited

hearing capability; and must avoid all exposure to hazards such as no work at heights or with

machinery.  Tr. 69-70.  The VE indicated that the described individual would be able to perform

Martin's past relevant work as generally or actually performed.  Tr. 69-70.

The ALJ then added to the hypothetical an additional limitation of frequent fingering,

feeling and grasping bilaterally.  Tr. 70.  With that additional limitation, the VE indicated that the

described individual would be able to perform Martin's past relevant work.  Tr. 70.  The ALJ

then added to the hypothetical an additional limitation of no fast pace or high production quotas and the VE indicated that the individual would remain able to perform Martin's past relevant work.  Tr. 70.

The ALJ next asked the VE whether an additional limitation of low stress work, meaning no arbitration, negotiation, confrontation, responsibility for the safety of others, or supervisory responsibility would have an impact on the individual's ability to perform Martin's past relevant work.  Tr. 70.  The VE indicated that, with that limitation, the described individual would not be able to perform Martin's past relevant work because it was more than low stress.  Tr. 70.  The VE indicated that there were other jobs that the hypothetical individual could perform, including (1) cashier II, a light, unskilled position with approximately 1,200 jobs available in Northeast Ohio, 50,000 in the state of Ohio, and 1,000,000 in the nation; (2) mail clerk (not in the post office), a light, unskilled position with approximately 1,400 jobs available in Northeast Ohio, 7,000 in the state of Ohio, and 139,000 in the nation; and (3) laundry folder, a light, unskilled position with approximately 3,000 jobs available in Northeast Ohio, 20,000 in the state of Ohio, and 394,000 in the nation.  Tr. 71.  In response to further inquiry from the ALJ, the VE indicated that, if the described individual would be off-task 15% of the time due to chronic pain, there would be no jobs available to the hypothetical individual.  Tr. 72.

The ALJ then asked the VE to consider the first hypothetical except with a change from light to sedentary level work.  Tr. 72-73.  The VE indicated that such an individual would be unable to perform Martin's past relevant work but there would be sedentary, semi-skilled positions available to the described individual, including credit card clerk; referral and information clerk; and lost charge card clerk.  Tr. 73.  The VE indicated that there would be approximately 4,000 such jobs in Northeast Ohio, 12,000 in the state of Ohio, and 676,000 in the

nation.  Tr. 73.  The ALJ then asked the VE whether any of the following limitations would

impact the availability of the jobs identified by the VE: frequent fingering and grasping

bilaterally; work with no fast pace or high production quotas; or low stress work, meaning work

with no arbitration, negotiation, confrontation, responsibility for the safety of others, or

supervisory responsibility.  Tr. 74.  The VE indicated that none of those limitations would

eliminate the jobs identified by the VE in response to the sedentary hypothetical.  Tr. 74.

However, a limitation of being off-task 15% of the time due to chronic pain would eliminate the

identified jobs.  Tr. 74-75.  In response to questioning by Martin's counsel, the VE indicated that

if there were no transferable skills, such as keyboarding, then there may be no sedentary jobs

available to the hypothetical individual limited to sedentary level work.  Tr. 75-80.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy[9] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[9] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the
region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[10] the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

---

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

## IV. The ALJ's Decision

In her September 12, 2012, decision, the ALJ made the following findings:[11]

1.    Martin has not engaged in substantial gainful activity since September 15, 2010.  Tr. 30.

2.    Martin has the following severe impairments: diabetes mellitus; coronary artery disease; neuropathy; hearing loss; vertigo; adjustment disorder with depressed mood; and anxiety.[12]  Tr. 30-31.

3.    Martin does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 31-32.

4.    Martin has the RFC to perform light work as defined in 20 C.F.R. § 416.967(b), meaning she is able to occasionally lift 20 pounds and frequently lift 10 pounds; is able to stand and walk for 6 hours in an 8-hour workday; is able to sit for 6 hours in an 8-hours workday; is able to perform unlimited pushing/pulling other than as stated for lifting/carrying; can occasionally climb ramps/stairs; can never climb ladders/ropes/scaffolds; can frequently balance, stoop, kneel, crouch, and crawl; has limited hearing and must avoid loud noises; must avoid all exposure to hazards – working at heights or with machinery; can frequently finger, feel, grasp bilaterally; can have no fast pace or high production quotas; and can perform low stress work, meaning no arbitration, negotiation, confrontation, responsibility for the safety of others, or supervisory responsibility . Tr. 32-35.

5.    Martin is unable to perform any past relevant work.  Tr. 35-36.

6.    Martin was born in 1958 and was 52 years old, defined as an individual closely approaching advanced age on the date the application was filed. Tr. 36.

7.    Martin has at least a high school education and is able to communicate in English.  Tr. 36.

8.    Transferability of job skills is not material to the determination of disability.  Tr. 36.

---

[11] The ALJ's findings are summarized.

[12] The ALJ found Martin to have the following non-severe impairments: hyperlipidemia, hypertension, and diverticulitis.  Tr. 31.

9.    Considering Martin's age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that Martin can perform, including cashier II, mailer clerk, and folder-laundry. Tr. 36-37.

Based on the foregoing, the ALJ determined that Martin had not been under a disability since September 15, 2010, the date the application was filed. Tr. 37.

## V. Parties' Arguments

### A.    Plaintiff's arguments

Martin presents two arguments for the Court's review. First, she contends that the ALJ erred in providing less weight to the opinion of Dr. Sioson, a one-time consultative examining physician, than to that of reviewing, non-examining physicians and the ALJ failed to provide good reasons for the weight assigned to the medical opinion evidence. Doc. 15, pp. 8-10.

Second, Martin seeks a sentence six remand under 42 U.S.C. § 405(g) for consideration of medical record evidence that existed at the time of Martin's August 7, 2012, administrative hearing but that was not presented to the ALJ. Doc. 15, pp. 10-12. Martin asserts that the evidence that was not presented to the ALJ at the August 7, 2012, administrative hearing is new and material because it shows that she suffered from carpal tunnel syndrome and polyneuropathy. Doc. 15, p. 11. She argues that remand is warranted under sentence six because her counsel advised the ALJ of the new diagnosis at the August 7, 2012, hearing but the ALJ failed to obtain the evidence. Doc. 15, pp. 11-12.

### B.    Defendant's response

The Commissioner asserts that the ALJ sufficiently explained her reasons for the weight assigned to the medical opinion evidence and substantial evidence supports the ALJ's analysis of the medical opinion evidence. Doc. 17, pp. 13-17.

The Commissioner also asserts that Martin has failed to meet her burden of establishing that a sentence six remand is warranted, arguing that Martin has made no attempt to demonstrate "good cause" and has failed to show that the evidence upon which she seeks a remand is "new" or "material."  Doc. 17, pp. 17-20.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.     The ALJ properly evaluated the opinion evidence**

Martin challenges the ALJ's assignment of weight to the opinion of one-time consultative examining physician Dr. Sioson, arguing that the ALJ erred by assigning more weight to the opinions of non-examining physicians and that the ALJ failed to provide good reasons for the weight assigned to the medical opinion evidence.  Doc. 15, pp. 8-10.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 416.945(a); 20 C.F.R. § 416.946(c).  It is the responsibility of the ALJ, not a physician, to assess a claimant's RFC.  *See* 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  In assessing a claimant's RFC, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*

As a one-time consultative examining physician, Dr. Sioson did not have an ongoing treatment relationship with Martin and therefore his opinion was not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006); *Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).   It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 416.927 and to explain the weight assigned.  *See* 20 C.F.R. § 416.927(e)(2).  However, the ALJ is not obliged to include in her decision an exhaustive factor-by-factor analysis of the factors.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

22

Although Dr. Sioson was not a treating physician, consistent with the regulations, ALJ considered Dr. Sioson's opinion and explained the weight assigned, stating:

> An evaluating medical consultant, Eulogio Sioson, M.D., C.I.M.E., examined the claimant at the request of the State Agency and opined that claimant would be limited to sedentary work (9/2/2009, Exhibit 2F).  The undersigned assigns less weight to this opinion, as Dr. Sioson even noted that he based this opinion "when one considers limitation of range of motion from pain," such as her complaint of pain in her right hip and groin.  However, he also noted no specific restrictions when such consideration is not given.  Furthermore, his opinion is not supported by the medical records from MetroHealth Medical Center.

Tr. 35.

The foregoing makes clear that the ALJ found Dr. Sioson's sedentary restrictions lacking in objective support and based only on Martin's subjective complaints.  Tr. 287.  Further, the ALJ assessed Martin's subjective complaints regarding her symptoms and found them not fully credible,[13] noting, for example, that Martin worked out several times a week. Tr. 33-35. Accordingly, the ALJ's determination that Dr. Sioson's opinion was entitled to less weight because it was based on Martin's subjective complaints, which the ALJ found not fully credible, is sufficiently explained and supported by the record.

The ALJ also explained that she was providing less weight to Dr. Sioson's sedentary restrictions because his opinion was not supported by the MetroHealth records.  Tr. 35.  Martin argues that the ALJ erred because he ALJ did not identify the specific evidence that she found did not support Dr. Sioson's opinion.  Doc. 15, p. 10.  However, the ALJ discussed in detail Martin's medical records when assessing her RFC.  Tr. 33-35.  For example, among other records discussed and considered, the ALJ noted that Martin's medical records have reflected full range of motion, 5/5 strength, no edema, and a normal gait (Tr. 33-34 (referencing among other records - Tr. 405, 418, 469, 635)) and that Martin was not taking any medications for pedal

---

[13] Martin has not challenged the ALJ's credibility assessment.

neuropathy (Tr. 34 (referencing Tr. 718)).  Moreover, an ALJ is not obligated to discuss every piece of evidence.  *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. 2004) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.").

Additionally, in assessing Martin's RFC, the ALJ also considered the opinions of Drs. Teague and Hall and concluded that the opinions of Drs. Teague and Hall were entitled to more weight because those opinions were "consistent with the record as a whole and . . . not contradicted by any treating source[,]" noting that "[i]n fact, there are no treating source opinions in the record." Tr. 35.  Dr. Teague conducted a review of Martin's file and concluded that Martin had the RFC to perform light work, with certain non-exertional limitations.[14]  Tr. 557-564.   In offering his opinion, Dr. Teague considered but gave little weight to Dr. Sioson's opinion, finding Dr. Sioson's sedentary restrictions to be more restrictive than the evidence suggested and noting that Dr. Sioson had not addressed Martin's severe hearing loss issues.  Tr. 563.  Martin claims that it was improper for the ALJ to give more weight to the opinions of non-examining physicians, Drs. Teague and Hall, than to Dr. Sioson because Dr. Sioson examined Martin.  Doc. 15, p. 9.  However, while the "examining relationship" is a factor to consider when weighing opinions, other factors to consider are supportability and consistency.  20 C.F.R. § 416.927(c).   As indicated, the ALJ considered the consistency and supportability of the opinion evidence and concluded that the state agency reviewing physicians' opinions were consistent with the record as whole and found Dr. Sioson's opinion lacking supportability.  Tr. 35.

Based on the foregoing, the Court finds that the ALJ properly considered the medical opinion evidence and the ALJ's decision is supported by substantial evidence, including, among other evidence, the opinions of state agency reviewing physicians Drs. Teague and Hall who

---

[14] Dr. Hall affirmed Dr. Teague's opinion on reconsideration.  Tr. 668.

opined that Martin had the RFC to perform light exertional with postural, communicative, and environmental limitations.  Tr.  35, 557-564, 668.

**B.      A sentence six remand is not warranted**

Martin seeks a sentence six remand under 42 U.S.C. § 405(g) for consideration of medical record evidence that existed at the time of Martin's August 7, 2012, administrative hearing but that was not presented to the ALJ.  Doc. 15, pp. 10-12.  Martin asserts that the evidence that was not presented to the ALJ at the August 7, 2012, administrative hearing is new and material because it shows that she suffered from carpal tunnel syndrome and polyneuropathy.  Doc. 15, p. 11.  She argues that remand is warranted under sentence six because her counsel advised the ALJ of the new diagnosis at the August 7, 2012, hearing but the ALJ failed to obtain the evidence. Doc. 15, pp. 11-12.

The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's review is limited to the evidence presented to the ALJ.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).   The statute permits only two types of remand: a sentence four remand made in connection with a judgment affirming, modifying, or reversing the Commissioner's decision; and a sentence six remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See, e.g., Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006). The court cannot consider evidence that was not submitted to the ALJ in the sentence four context; it only can consider such evidence in determining whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.

The plaintiff has the burden under sentence six of 42 U.S.C. § 405(g) to demonstrate that the evidence she now presents in support of a remand is "new" and "material," and that there was "good cause" for her failure to present this evidence in the prior proceeding. *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010) (although the material that the claimant sought to introduce was "new," the claimant failed to meet her burden of showing "good cause" for failure to submit materials and that the evidence was "material.").

Evidence is "*new* only if it was not in existence or available to the claimant at the time of the administrative proceeding." *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted and emphasis supplied). "[E]vidence is *material* only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* (internal quotations and citations omitted and emphasis supplied) "A claimant shows *good cause* by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id.* (internal quotations and citations omitted and emphasis supplied).

While Martin argues that the evidence is "new" and "material," she has not argued "good cause" for failing to obtain and present the evidence at the hearing. (Doc. 15, p. 11, Plaintiff's brief stating that "Effectively the law requires remand where it is shown that there is evidence which is both 'new' and 'material.'"). As part of her argument that the evidence is "new," Martin asserts, however, that a sentence six remand is warranted because at the hearing her legal counsel advised the ALJ of "recent" diagnoses of carpal tunnel syndrome and polyneuropathy but the ALJ failed to obtain those records. Doc. 15, pp. 11-12 To the extent that the foregoing is an attempt to argue that "good cause" should be found because the ALJ had a heightened duty to develop the record but failed to so, her argument is without merit because, absent special

26

circumstances, such as where a claimant is not represented by counsel,[15] which are not present in this case, there is no heightened duty on an ALJ to develop the record and the claimant bears the burden of proving disability.  *See Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. 2008).

Additionally, Martin is unable to demonstrate "good cause" or a failure by the ALJ to properly develop the record because, when the ALJ asked Martin's counsel whether there were "any additional records to submit," Martin's counsel responded, "No, your honor, I believe the record is complete now."  Tr. 46.  Further, when Martin's counsel advised the ALJ of the diagnosis of carpal tunnel, he stated, "She's been recently diagnosed with carpal tunnel syndrome.  However, there's really not sufficient documentation in the file.  This is just a very recent diagnosis so we don't have a complete one, medical record to support that too much."  Tr. 50.  With respect to her alleged polyneuropathy, Martin's counsel stated that Martin's neuropathy in her hands and toes was a condition "that's starting to rise" and indicated that, with the recent diagnosis of carpal tunnel, Martin's tingling in her hands might not be neuropathy.  Tr. 50.  The foregoing does not demonstrate "good cause" for Martin's failure to submit evidence she asserts supports for her claim for disability nor does it demonstrate that the ALJ failed in her duty to properly develop the record.

It is Martin's burden to establish all three of the elements for a sentence six remand. Even if Martin could demonstrate that the evidence was both "new"[16] and "material," her request

---

[15] Other "special circumstances" might include an inability to present an effective case or a lack of familiarity with hearing procedures.  *Wilson*, 280 Fed. Appx. at 459.

[16] It is unlikely that Martin can satisfy her burden of showing that the evidence is "new" since evidence she seeks to have considered as part of sentence six remand existed at the time of the hearing.  Doc. 15, p. 11 (Plaintiff's brief – acknowledging that evidence existed at the time of Martin's hearing showing Martin suffered from carpal tunnel syndrome and polyneuropathy).

for a sentence six remand fails because she has not shown "good cause" for her failure to obtain or present the alleged "new" evidence to the ALJ.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

August 4, 2015

Kathleen B. Burke
United States Magistrate Judge